**W. B. CHRISTOPHER et al., Appellants,**

**v.**

**Sam GARRETT et ux., Appellees.**

**No. 6891.**

Court of Civil Appeals of Texas.

Texarkana.

June 14, 1956.

Rehearing Denied July 12, 1956.

Florence, Florence & Garrison, Gilmer, for appellants.

W. Clyde Hull, W. C. Hancock, Pittsburg, for appellees.

FANNING, Justice.

W. B. Christopher and the heirs of his deceased wife, Lela Christopher, sued Sam Garrett and wife, Vernell Garrett, in trespass to try title for a 10-acre tract of land in Camp County, Texas. Defendants disclaimed as to all of the land except two acres, pleading a parol contract of sale of the two acres between W. B. Christopher and wife, Lela Christopher, as grantors and John Henry Kelly and wife, Martha Jane Kelly, as grantees, and further pleaded in the alternative that the grantors in said parol contract placed the grantees in possession of the two acres, stood by, permitted and encouraged said grantees to place valuable and permanent improvements upon said land, etc., and in effect

pleaded "good faith" and equitable grounds by reason of which they sought recovery of the value of the improvements placed on the property. Plaintiffs-appellants pleaded the statute of frauds and other defenses and denied the parol contract of sale as pleaded by defendants-appellees, and pleaded instead in effect that the parol contract was that the Kellys would purchase the lumber for the building of a house on the land, and that appellant W. B. Christopher would do the mechanic work and construct the house on his land and that the Kellys were to have the use of the property until their death, with the understanding that upon the death of the Kellys the house would be his property.

Lela Christopher and Vernell Garrett were both daughters of John Henry Kelly and Martha Jane Kelly. The 10-acre tract of land (which included the two acres in controversy) was the community property and homestead of W. B. Christopher and wife, Lela Christopher. Lela Christopher died intestate before the death of her mother and father, the Kellys. There was no administration had on the estate of Lela Christopher and none was necessary. The appellants other than W. B. Christopher are the heirs at law of Lela Christopher. Mr. and Mrs. Kelly died testate and left as their sole devisee and legatee the appellee Vernell Garrett.

In response to special issues submitted the jury found in essence: (1) That W. B. and Lela Christopher agreed to sell to, and John Henry and Martha Jane Kelly agreed to buy, the two-acre tract of land before the house was built thereon for a consideration of $26 per acre; (2) that John Henry Kelly and wife occupied and possessed the property in controversy in good faith; (3) that John Henry Kelly and Martha Jane Kelly placed improvements of the value of $2,250 upon the land in controversy; (4) that such improvements increased the value of the property by the sum of $2,250; (5) that the value of the use of the two acres exclusive of improvements for the period of two years prior to the trial was $80; (6)

that the rental value of the two acres, exclusive of improvements, from the summer of 1936 to September 5, 1955, was $750; (7) that the Christophers and Kellys did not enter into the agreement that was pleaded by the plaintiffs.

The trial court rendered judgment for plaintiffs-appellants for the title to the two acres in controversy, and in said judgment provided that no writ of possession would issue for a term of one year from the date of said judgment if no appeal was perfected therefrom and if appeal was perfected therefrom then for one year after date of final judgment, unless the plaintiffs paid to the clerk of the court for the defendants the sum of $1,500 with 6% interest thereon, etc., and further that should plaintiffs fail to pay same within said period of time, that the defendants would have the right (within six months after the expiration of the one-year period) to remove the house from the two-acre tract at their own expense, responding to plaintiffs for any damage to the soil, if any, that might be incurred in removal, and said judgment further provided that if defendants failed to remove said house within the said six months period, that in such event plaintiffs could sue out their writ of possession. Plaintiffs have appealed from the portion of the judgment awarding defendants $1,500 for improvements or in lieu thereof the right to remove the house in question.

Appellants present five points. Appellants' fifth point reads as follows:

"The court erred in permitting appellees to offer in evidence and read to the jury the will of John Henry and Martha Kelly, and other instruments relating to said will, over the objections of appellants."

Appellants cite no authorities in their brief in support of their fifth point. We think appellants' fifth point is without merit and same is overruled.

By their Points 1 and 3, appellants contend in essence that the trial court erred

in submitting to the jury Special Issues Nos. 1 and 2 because "there was no competent evidence introduced upon the trial of this cause that authorized the submission of said issue." By their Points 2 and 4 appellants contend in essence that the trial court erred in not disregarding the jury's answers to Special Issues Nos. 1 and 2 because "the evidence is wholly insufficient to support same." Appellants in their brief, among other things, state: "We contend that no evidence was introduced that ever showed that Mr. Christopher and more particularly Mrs. Christopher, ever entered into such a contract as found by the jury in answer to Special Issue No. 1. Since the property was the homestead of the Christophers, it would be necessary that she be a party to such an agreement." Appellants also contend to the effect that there was no good faith possession on the part of the Kellys.

Appellees contend to the effect that the evidence was sufficient to support the jury's findings to Special Issues Nos. 1 and 2. Appellees also contend to the effect that the evidence sufficiently shows that both Mr. and Mrs. Christopher were parties to the parol executory agreement but that it was their further position that it was unnecessary for Mrs. Christopher to have been a party to the parol executory contract to sustain the equitable judgment rendered by the trial court and that under the facts in this case such judgment was correct.

There was testimony in the record to the effect that Mr. and Mrs. Christopher agreed to sell to Mr. and Mrs. Kelly the two acres of land in question (most of the testimony was largely to the effect that Mr. Christopher did most of the talking about the trade with the Kellys; however there was testimony to the effect that Mrs. Christopher was present on an occasion as hereinafter more particularly related in the testimony of the witness Lilly Kelly); that the two-acre tract of land was to be one-half acre wide and four acres deep; that the deed was to be made when the loan against the land was paid off; that

Mr. and Mrs. Kelly agreed to build the house on the two acres; that Mr. and Mrs. Kelly agreed to pay $26 per acre for the land; that Mr. and Mrs. Kelly did build the house (in 1936 or 1937) on the two acres of land in question; that after the house was built Mr. and Mrs. Kelly moved into the house and lived there until their deaths; that the Kellys claimed to own the property; that Mr. Kelly was not an educated man. The witness Buster Kelly also testified in particular as to an occurrence where he testified as to the agreement to make the deed in question wherein he testified to the effect that he carried Mr. W. B. Christopher and his father and mother, the Kellys, to Mt. Pleasant to see about making the deed wherein Mr. Christopher went to the office of the Federal Farm Loan Association and stated to the Kellys to the effect that he could not deed them the land then because of the loan against the land but that "when he got it settled he would make arrangements with them and deed it to them." He further testified that they then agreed to go ahead and build the house. He further testified that Mr. and Mrs. Kelly did not then pay Mr. Christopher for the land but that they agreed to pay $26 per acre. (Mrs. Lela Christopher was not present on the trip to Mt. Pleasant.)

Mr. W. B. Christopher admitted making the trip to Mt. Pleasant with the Kellys. We quote from his testimony as follows:

"Q. Mr. Christopher, did you and Buster Kelley and Mrs. Kelley go to Mt. Pleasant to see the Fed Farm Loan man along about that time before this house was built? A. Yes, sir.

"Q. What did you go over there for? A. Well, they was after me trying to buy the land and I told them I couldn't sell it and they kept on until I went with them over there to prove that I could not sell it to them.

"Q. Did you ever go see any lawyer with reference to deeding it to them? A. No, sir.

"Q. You wasn't trying very hard to see if you could sell it were you, Mr. Christopher? A. Well, I didn't want to sell it.

"Q. You didn't want to sell it? A. No, sir.

"Q. But they wanted to buy it? A. No, they didn't say after that they wanted to buy it.

"Q. But they got you to go with them to Mr. Pleasant to see Mr. Hart, didn't they? A. Yes, sir.

"Q. That's how come you to go was because they got after you to go, didn't they? A. Yes, sir.

"Q. That was a mistake though wasn't it Mr. Christopher, you could have sold the land even though it had a loan on it? A. No, sir. * * *

"Q. Mr. Christopher when you told Mrs. Kelley and Buster Kelley that you couldn't deed two acres to them because there was a loan on it, that's what you told them wasn't it? A. Yes, sir.

"Q. But when you bought it it had a loan on it, didn't it? The same loan. Just tell the Jury over there if it didn't have the same loan on it. A. There wasn't no mortgage on it.

"Q. Yes, there was, the same mortgage that it is now, wasn't it? A. It was mortgaged to Kennedy.

"Q. I know but you assumed the one to the Federal Land Bank, didn't you? A. Yes, I think—I bought it from them.

"Q. That's right, you got a deed when that loan was already against it, yet you told Mr. and Mrs. Kelley— A. The loan told them that. The Federal Land Bank, Mr. Hart told them that.

"Q. Did they tell them that or did they tell you that? A. Hart told them that, he told me and Mrs. Kelley.

"Q. Did Mrs. Kelley go with you in to see Mr. Hart? A. She sure did."

Mr. Christopher denied making the parol contract in question but admitted that the house was built on the land with his permission. We quote from Mr. W. B. Christopher's testimony as follows:

"Q. Did you ever agree to convey the land or any part of that land to anybody at any time? A. No, sir, I haven't.

"Q. Were you acquainted with Mr. and Mrs. Kelley, who were the mother and father of your first wife? A. Yes, sir.

"Q. Did you have any kind of understanding or agreement with those people with reference to a house out there? A. Yes, sir.

"Q. Tell this jury over here what the agreement that you had with them was? A. Well, they didn't have nowhere to go to and they were out of a home, and *they come to me and my wife one night* about eight o'clock, they got there in a wagon, and they asked us about the land and I told them I didn't know whether I could sell a foot of land or not, I told them I didn't want to sell none of my land, it wasn't for sale, but they kept on until *we agreed to go* over there with them; and I told them we could not sell the land as long as I had it mortgaged, it was mortgaged to Kennedy, he had the second lien on it and the Federal Land Bank had the first lien on it, and they said well if you will let us build the house on it before Mr. Kennedy up there, they said if he will let us build a house on it and live there for the rest of our days at our death this house will fall to you, all the stuff that we put there will fall to you at our death and *that was said before me and my wife.*

"Q. Was there anything said about whether the house was ever to be moved off? A. No, sir, there wasn't nothing mentioned about it ever to be moved.

"Q. It was not to be moved? A. No, sir, it was not to be moved, it was *ours* at their death.

"Q. Now, under that situation did you agree to that, to let the house be built there? A. Yes, sir.

"Q. And it was not to be moved and *at their death it was to belong to you and your wife?* A. Yes, sir, she made the trade herself, Mrs. Kelley did.

"Q. That's what she agreed to do? A. Yes, sir."

We quote from the testimony of Mrs. Lilly Kelly as follows:

"(Direct Examination)

"Q. Where were you the first time you heard a conversation between Mr. Christopher and Mrs. Kelley and Mr. Kelley? A. We were in a little new house that Buster had built at time where Mr. and Mrs. Kelley was living with Buster.

"Q. Was Mr. Christopher there? A. Yes, *they* were there.

"Q. What was said there on that particular occasion? A. Well, I don't know that I could pin point that, it was just under discussion and they were not sure where to build their home and Willis and *Lela* volunteered that they would sell them two acres of land there.

"Q. Did they say what price they would sell them that land? A. Twenty Six Dollars an acre, I believe that's the price.

"Q. Did they say how much they would sell them? A. Two acres of land, that's what they decided on."

"(Redirect Examination by Mr. Hull)

"Q. Was or not Mrs. Lela Christopher present at the time of that conversation?

*   *   *   *   *   *

"Q. Was Mrs. Lela Christopher present? A. She was, sir."

"(Recross-examination by Mr. Florence)

"Q. Why didn't you tell me while ago she was present? A. You didn't ask me, sir.

"Q. I asked you who was present, and you said Mr. W. B. Christopher and Mr. and Mrs. Kelley? A. I am sorry, sir, I thought that you asked me who was in the conversation.

"Q. Well, you didn't tell me Mrs. Christopher was in it, did you? A. No, sir, I didn't.

"Q. Why didn't you? A. You didn't ask me.

"Q. I asked you who was present, didn't I? A. Well, no sir, you asked me who was in the conversation.

"Q. Well, did you tell me who was in it? A. Yes, sir.

"Q. Did you tell me Mrs. Christopher was in it? A. I don't remember that she said anything.

"Q. What makes you now think she was present? A. I know she was present, because Willis seldom ever came to his mother-in-law's home unless he brought Lela.

"Q. Is that the reason you say she was present? A. No, I know she was there.

"Q. Where was she when this conversation took place? A. We were all in the house.

"Q. In the house? You never heard Mrs. Lela Christopher say a

word? A. I don't recall that she did, she probably did but at this time I don't recall anything that she said, I would be afraid to say.

"Q. In other words she was just there so far as you know, she took no part in the conversation at all? A. She probably did, I do not remember.

"Q. So far as you know and can now recall she never said a word? A. I don't recall that she did."

"(Redirect Examination by Mr. Hull)

"Q. You don't recall Mrs. Christopher making any objection do you, to selling the land? A. No sir." (Italics ours.)

The record shows that Martha Jane Kelly died in 1951, and her husband died in 1952; that they constructed the house in question in 1936 (or 1937), and lived continuously in said house on said two acres until their deaths without being disturbed in their possession by anyone. Mrs. Lela Christopher, the wife of W. B. Christopher, and the daughter of the Kellys, died in 1950, and there is nothing in the record to show that she ever questioned the alleged parol contract to convey or the right of her parents with reference to their possession and occupancy of the house and the two acres in question. Mr. Christopher denied the alleged parol contract to convey but the jury apparently did not believe this part of his testimony, which was within the province of the jury to so disbelieve.

The trial court correctly awarded the title to the two acres in question to appellants. Since the consideration ($26 per acre for the two acres) was never paid, the parol sale failed and was not taken out of the statute of frauds. In Massey v. Lewis, Tex.Civ.App., 281 S.W.2d 471, 475, writ ref., N.R.E., it is stated:

" 'Payment in full of the consideration is required before a parol sale of land can be enforced and a mere tender of the consideration or an expression of a willingness to pay such consideration or the balance due thereon is not sufficient.' Salas v. Salas, Tex.Civ. App., 229 S.W.2d 881, 884, and authorities there cited. See also Robertson v. Melton, 131 Tex. 325, 115 S.W.2d 624, 118 A.L.R. 1505; Garza v. Martinez Mercantile Co., Tex.Civ.App., 208 S. W.2d 567, w/r, n. r. e."

In 20 Tex.Jur., p. 304, it is stated:

"Although he may not be entitled to specific performance of a parol agreement for the sale and conveyance of land, one who, as a purchaser, has in good faith made improvements thereon, may recover the reasonable value of such improvements."

In 23 Tex.Jur., p. 378, it is stated:

"Again, when a vendor takes advantage of the fact that a contract is void because of the statute of frauds the purchaser may have compensation for improvements made while he was in possession."

In 22 Tex.Jur., pp. 113, 114, it is stated:

" 'Specific performance will not be decreed of an executory contract for the sale of a homestead, though signed and acknowledged by both husband and wife, in the manner required for the conveyance of such property.'

"Generally speaking, if the contract has been fully executed by the other party, performance by the owner may not be resisted on the score that the property is his homestead; and, *in any circumstances apparently, the purchaser is entitled to be compensated for improvements.*" (Italics ours.)

(Cited in support of the italicized quotation above is the case of Eberling v. Deutscher Verein, 72 Tex. 339, 12 S.W. 205, where it was held under the facts of that case that a purchaser by executory

contract from the husband alone of a part of the homestead, who erected improvements in good faith with the consent and without objection from the husband and wife, would on cancellation of the contract to purchase on the suit of the husband and wife, be entitled to an allowance for the value of the improvements made.)

■ Articles 7393 to 7399, incl., V.A.C.S., provide a statutory method for trial and allowance of claims for improvements on lands made in good faith. It has also been held that strict compliance with respect to this statutory method is not always necessary as defendants in a trespass to try title suit could also recover under general equity principles the value of improvements made by them in good faith on the property involved made with the knowledge, acquiescence and consent of the plaintiffs adjudged to be the legal owners thereof. In Nilsen v. Bonugli, Tex. Civ.App., 220 S.W.2d 178, 180, it is stated:

The situation presented, therefore, is one in which the appellees have entered into possession of property under the belief that they were acquiring the same as their own, but under a contract which was legally unenforcible. They made certain improvements or repairs with the knowledge and consent of the legal owner of said property. It seems that most of the claims for 'improvements' asserted by appellees could not be recovered under Articles 7393 and 7394, Vernon's Ann. Civ.Stats., as there is no evidence of the value of such improvements at the time the suit was filed, other than testimony relating to the original cost thereof, nor is there any evidence upon which an estimate of the value of the property with or without the improvements could be based. Article 7394; Thomas v. Quarles, 64 Tex. 491. However, it has been held that the recovery of the value of improvements

made in good faith does not depend entirely upon the statute but may be afforded under the general principles of equity. 23 Tex.Jur., 382 § 9. It has also been pointed out that strict compliance with the statute is not necessary to obtain relief when the improvements are made with the full knowledge, acquiescence and consent of the owner of the land. Chief Justice Hemphill, in Saunders v. Wilson, 19 Tex. 201, said: 'It is a familiar principle of equity, independent of the statute, that if the true owner stands by and suffers improvements to be made on his land, without notice of his title, he must pay for the improvements, on the maxim that he ought to have spoken when he was silent (quia tacuit cum clamare debuit), and on the rule of natural justice, that no one should be enriched by the loss or injury of another.' "

In Hurst v. Webster, Tex.Civ.App., 252 S.W.2d 793, 795, wr. ref., N.R.E., R. L. Hurst and wife sued Marguerite Webster, a widow, in trespass to try title to recover 1.44 acres of land, of which Mrs. Webster and her late husband had been in possession of a part for over nine years. Mrs. Webster pleaded that the Hursts agreed to sell and did sell by parol contract to her and her late husband the 0.42-acre tract in question; she pleaded in the alternative a parol gift of the land; she also pleaded in the alternative that believing in good faith they owned the land she and her husband made permanent and valuable improvements thereupon in the value of $10,000, and sought recovery therefor and such further relief, in equity and in law, that she might be entitled to, etc. The jury in this case found against Mrs. Webster upon both of the issues with respect to the alleged parol sale and the alleged parol gift. The jury, however, found that Mrs. Webster and her husband made valuable and permanent improvements upon the land

in question with the consent of the Hursts. The jury also specifically found that Mrs. Webster and her husband erected the improvements on the land in question in the good faith that the tract of land was to be theirs. Upon other findings of the jury and additional findings reflected in the trial court's judgment, the Hursts were decreed the title to the land in dispute but it was provided in the judgment that no writ of possession should be issued for a term of one year, etc., unless the plaintiffs paid to the clerk of the court for defendant the sum of $6,342.50 with interest, etc., and making certain other provisions in the judgment if said amount was not paid within a certain stated time in the judgment. We quote from the court's opinion in Hurst v. Webster, supra, as follows:

"It appears from the trial court's judgment that it undertook to adjust the differences between the parties by rules of equity. Under findings of the jury, we do not believe that the judgment is unreasonable or unfair. Therefore, we will not disturb such equitable distribution. Since the jury found that appellee is entitled to recover the sum of $6,342.50 for the value of improvements placed on the property in good faith, to hold for appellants would be enriching them to the value of such amount at the expense of appellee."

The five points aboved referred to are all of the points presented by appellants. The present no point specifically attacking the judgment of the trial court or any specific provisions thereof as being inequitable, unreasonable or unfair, nor do they present any specific point that the amount of $1,500 for the value of the improvements in question was excessive or improper. Under the equitable judgment rendered by the trial court the appellants have the choice of paying $1,500 for the improvements or of having them removed from the property by appellees, with the appellees responding in damages for any injury to the soil (if any) which might be occasioned by a removal of the house.

■ It is our opinion that the equitable judgment rendered by the trial court in this cause is not inequitable, or unreasonable or unfair, is sufficiently supported by the evidence in this cause, the findings of the jury and by the entire record in this cause, and should not be disturbed. Appellants' points are respectfully overruled.

The judgment of the trial court is affirmed.