Raymond D. WATSON et al., Appellants,

v.

DRUID HILLS COMPANY, Appellee.

No. 15948.

Court of Civil Appeals of Texas.

Dallas.

Jan. 19, 1962.

Rehearing Denied Feb. 16, 1962.

**66**

C. C. Renfro, Dallas, for appellants.

Eades & Eades, Eric Eades, Jr., Dallas, for appellee.

DIXON, Chief Justice.

This is an appeal from a summary judgment in favor of Druid Hills Company, a corporation, appellee here and plaintiff in the trial court, in a suit in trespass to try title concerning Lot No. 8 in Kiestview Addition in Dallas, Texas.

Appellants, Raymond D. Watson and wife Corrinne A. Watson, claimants of title, and Oak Cliff Savings & Loan Association, claimant of a first lien, made no serious effort to dispute appellee's legal title to the property in question. However, they did plead and now urge several alleged equitable grounds for judgment in their favor based on an oral agreement of sale between appellee and one Perry Greenspan, Jr.

In reply to appellants' answer appellee filed a supplemental petition in which it pled the Statute of Frauds, Art. 3995, § 4, Vernon's Ann.Civ.St., and the Statute of Conveyances, Art. 1288, V.A.C.S.

Greenspan, a building contractor, was also a party defendant, but he did not file an answer and has not appealed from the judgment in favor of appellee.

The Watsons in addition to their plea of not guilty and their equitable defenses, implead Jesse V. Ambler and wife, Janet Ambler, praying in the alternative for judgment over against the Amblers based on a warranty deed from the Amblers to the Watsons. This cross-action was severed from appellee's suit by authority of Rule 174(b), Texas Rules Civil Proc., and was given a separate number and docketed as a separate suit. Therefore we are concerned on this appeal only with the judgment in favor of appellee in its suit in trespass to try title.

FACTS

Some time in 1958 Perry Greenspan, Jr., a building contractor, entered into an oral agreement with A. B. McDaniel, President of appellee corporation, for the purchase by Greenspan of five lots in Kiestview Addition, a sub-division developed by Druid

Hills Company. He agreed to pay $3,500 for one lot, and $3,100 for each of the other four lots.

Appellants do not dispute the fact that at the time of the oral agreement between appellee and Greenspan appellee had title to the five lots, including Lot No. 8, the subject of this controversy. Appellee's title is evidenced by warranty deeds to certain acreage out of which was carved Kiestview Addition. Greenspan did not obtain a deed or any other memorandum in writing signed by appellee or any of its officers or agents evidencing the sale of any of the five lots.

However, he did cause a title company to prepare five sets of papers, one set for each lot as follows: (1) a note covering the purchase price; (2) a deed of trust securing payment of the note; (3) a warranty deed from appellee to Greenspan; and (4) an agreement subordinating appellee's note to a construction loan which Greenspan expected to obtain to enable him to build a house on each lot. Greenspan signed each of the notes, and each deed of trust. The title company, according to the affidavit of one of its employees, then mailed the five notes, the five warranty deeds and the five subordination agreements to appellee. The title company retained possession of the deeds of trust. They were never filed for record.

There is no evidence that the warranty deeds and subordination agreements forwarded by the title company were ever signed by appellee, or anyone authorized to sign in its behalf. A. B. McDaniel, appellee's president, testified in a deposition that he did not remember appellee's ever receiving the instruments, but that if they were received at appellee's office they were either returned or thrown away. He was positive they were not signed by appellee.

Though he had not obtained warranty deeds or any other memorandum of title to the five lots, Greenspan proceeded to build houses on them. He then sold three of the houses and lots in connection with these

sales he paid the purchase price of each of the three lots to appellee and appellee, by warranty deeds, conveyed title to these three lots to Greenspan.

After completing houses on the other two lots, Greenspan sold them to certain purchasers, but appellee refused to execute warranty deeds to Greenspan or his purchasers, the two lots being Lot No. 6 and Lot No. 8, of Kiestview Addition. It is only the title to Lot No. 8 that is the subject matter of this appeal.

In a deposition A. B. McDaniel, President of Druid Hills Company, explained why his company refused to execute a warranty deed to Greenspan or his purchasers for Lots Nos. 6 and 8. Sometime prior to the present controversy Greenspan had purchased four lots in another addition developed by appellee, the said development being known as Druid Hills Addition. Greenspan had executed deed of trust notes for the purchase price of these four lots. The deeds of trust were not recorded. Greenspan built houses on these four lots. Later he sold them, but he did not pay the four notes held by appellee.

According to McDaniel in June of 1959 Greenspan started construction of the house on Lot No. 8. That same month McDaniel in a telephone conversation informed Greenspan that appellee company would not sign a warranty deed to Lot No. 8 unless the four notes on the four lots in Druid Hills Addition were paid. Greenspan then assured McDaniel that he would pay the four notes out of funds to be derived from the sale of Lots Nos. 6 and 8 and the houses he was constructing on them. Greenspan thereafter continued construction of the two houses—a fact which was known to McDaniel. McDaniel testified he did not protest the continued construction of the two houses because of Greenspan's promise to pay the four past due notes on the Druid Hills Addition Lots out of the proceeds of the sale of the houses and Lots Nos. 6 and 8 in the Kiestview Addition.

Subsequent to the giving of the above testimony by McDaniel, Greenspan made an affidavit concerning the transactions here involved. He did not deny or contradict the testimony of McDaniel as above set out.

It is undisputed that Greenspan, though he had no deed to Lot No. 8, executed and delivered a warranty deed to the property to Jesse V. Ambler and wife Janet Ambler. In his affidavit Greenspan says that he gave the deed to Ambler and wife "in order to pay the construction loan on Lot 8." The Amblers thereafter executed a note for $16,300 dated June 29, 1959 payable to Oak Cliff Savings & Loan Association and secured purportedly by a vendor's lien and deed of trust lien. The Amblers later executed and delivered a warranty deed purportedly conveying the property to appellants Raymond D. Watson and wife Corrinne A. Watson.

Greenspan has not paid the four past due notes owed by him as the purchase price of the four lots in Druid Hills Addition. He has not paid the purchase price of Lots 6 and 8 in Kiestview Addition.

After learning that Greenspan had never obtained a deed to Lot No. 8 from appellee the Watsons made a tender of $3,100 to appellee in consideration of the execution and delivery by appellee of a warranty deed to the property. This offer has been renewed in the answer of the Watsons to appellee's suit. Appellee has rejected said tender.

## OPINION

In an effort to controvert appellee's motion for summary judgment appellants rely on the deposition of A. B. McDaniel and the affidavits of Raymond D. Watson, Perry Greenspan, Jr., and Winnie B. Dollins, an employee of the title company, who prepared the five sets of documents at the request of Greenspan.

■ The affidavits do not meet the requirements of Rule 166–A(e). They recite that the affiants are not disqualified from testifying upon a trial of this suit. They do not recite that the affidavits are made on personal knowledge and they do not show affirmatively that the affiants are competent to testify to the matters stated in their affidavits.

In Watson's written answer to appellee's suit he alleges that he has made permanent and valuable improvements on Lot 8 by leveling the ground, setting out shrubs and grass and erecting permanent clothesline equipment in a total sum of $160. In his affidavit he states that the prices paid for these improvements were fair and reasonable and enhanced the over-all value of the property in an amount equal to the expenditures so made. There is nothing in his affidavit to show that he is competent to testify to such facts.

It has often been held that a compliance with Rule 166–A(e) is necessary if affidavits are to be given consideration in a summary judgment proceeding. Lawyers Surety Corp. v. Sevier, Tex.Civ.App., 342 S.W.2d 604; Duffard v. City of Corpus Christi, Tex.Civ.App., 332 S.W.2d 447; Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396.

However, we need not rest our decision in this case on the defects in the affidavits offered by appellants. For if we accept as true all the matters stated in said affidavits and in McDaniel's deposition, the undisputed facts, as a matter of law, support appellee's claim of title and refute appellants' alleged equitable defenses.

Appellant's first, second and third points on appeal are that the court erred in awarding appellee a summary judgment because (1) there was an enforceable contract of purchase of the property in effect; (2) the pleadings, depositions, and supporting affidavits were sufficient to enforce the Watsons' claim and to have issues of fact determined by a jury; and (3) the pleadings, affidavits and depositions present several material issues of fact.

■ In their brief appellants say that "the copy of the note and the original deed

of trust left with the title company were sufficient to constitute an enforceable right to the lot here involved * * *". With this statement we are unable to agree. There is no showing that appellee ever signed any written memorandum in connection with the purported sale to Greenspan. In fact all the evidence is to the contrary. It is not enough that Greenspan signed certain documents. To satisfy the Statute of Frauds, Art. 3995, V.A.C.S. it is necessary that a memorandum in writing be signed by the person to be charged. Gruss v. Cummins, Tex.Civ.App., 329 S.W. 2d 496; Baker v. Baker, Tex.Civ.App., 207 S.W.2d 244; Imholz v. Southern Oil Corp. of America, Tex.Civ.App., 134 S.W.2d 301. In this case the person to be charged was appellee Druid Hills Company, not Greenspan.

■ The fact that the title company may have mailed to appellee the deed of trust note signed by Greenspan, the subordination agreement and the warranty deed prepared for appellee's execution, does not constitute an acceptance by appellee of the sale of the property. Justice Sharp, speaking for our Supreme Court in American National Ins. Co. v. Warnock, 131 Tex. 457, 114 S.W.2d 1161, 1164, said:

"To form a binding contract, it must appear that the party to whom the offer is made accepts such offer and communicates such acceptance to the person making the offer; and, in the case of an offer to buy or sell land, the acceptance must be in writing. The facts of this case do not furnish the essential requisites to make a binding contract. This Court, in Patton v. Rucker, 29 Tex. 402, said: 'In order to their enforcement by the courts, contracts for the sale of land must be evidenced by writing. When the writing relied on contains within itself all the particulars of a concluded contract, it is sufficient if it be signed by the party against whom it is sought to be enforced; but if, instead of being evidence of a concluded agreement, whatever may be its form, it is really a mere proposal, such a writing is turned into an agreement, and can be enforced in equity by the other party only by his acceptance of it in writing.' "

■ In the well-known case of Hooks v. Bridgewater, 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216, our Supreme Court has stated that the presence of three elements is necessary to relieve an oral sale of real estate from the Statute of Frauds. These elements are (1) payment of the consideration in full; (2) adverse possession by the vendee; and (3) the making of permanent and valuable improvements on the land with the consent of the vendor. The first two of the elements are missing in the instant case.

■ It is undisputed that Greenspan has never paid the $3,100 purchase price for Lot No. 8, nor have the appellants. It is true that long after the Watsons had accepted a warranty deed from the Amblers (who had earlier accepted a warranty deed from Greenspan) and long after Oak Cliff Savings & Loan Association had advanced the $16,300 to take up a "construction loan" obtained by Greenspan from South Oak Cliff Bank & Trust Company, a tender of payment of the purchase price was made to appellee. But appellee did not accept the tender and was not obliged to do so. Robertson v. Melton, 131 Tex. 325, 115 S.W. 2d 624, 118 A.L.R. 1505; Tian v. Tacquard, Tex.Civ.App., 147 S.W.2d 1114; Salas v. Salas, Tex.Civ.App., 229 S.W.2d 881; Massey v. Lewis, Tex.Civ.App., 281 S.W.2d 471; Christopher v. Garrett, Tex.Civ.App., 292 S.W.2d 926.

■ The record also discloses that Greenspan did not have adverse possession as against appellee. It is true Greenspan proceeded to build a house on Lot 8 with appellee's knowledge and apparent consent. But the undisputed testimony is that A. B. McDaniel, president of appellee company, did not protest this action by Greenspan be-

cause Greenspan promised that if he were permitted to continue with the construction he would pay appellee for Lots Nos. 6 and 8 in Kiestview Addition as well as for the four lots he had earlier bought from appellee. Therefore, Greenspan's possession was not adverse or hostile to appellee, but was subservient to appellee's claim of title. Pappas v. Gounaris, 158 Tex. 355, 311 S.W. 2d 644.

■ Under some circumstances McDaniel's uncontradicted testimony in regard to Greenspan's promise might be held to raise only a fact issue, since it comes from an interested party. But as earlier pointed out in this opinion, Greenspan in an affidavit made subsequent to McDaniel's testifying does not deny, dispute, or contradict McDaniel on the point in question. Therefore, McDaniel's testimony does more than raise a fact issue; it is entitled to be accepted as true. Bayou Drilling Co. of Texas v. Baillio, Tex.Civ.App., 312 S.W.2d 705; Bartsch v. Ruby, Tex.Civ.App., 229 S.W.2d 105; England v. Pitts, Tex.Civ.App., 56 S. W.2d 493.

Appellants argue that since McDaniel, appellee's president, knew that Greenspan was constructing a house on Lot No. 8, and did not stop Greenspan from proceeding with said construction, appellee is estopped to deny appellants' title. In view of the record in this case we are unable to agree with this contention. Appellee's oral agreement was with Greenspan, not appellants. Greenspan breached his oral agreement with appellee, consequently neither he nor appellants may urge their equitable defenses as an estoppel entitling them to specific performance. Salas v. Salas, Tex.Civ. App., 229 S.W.2d 881; Bell v. Rudd, 144 Tex. 491, 191 S.W.2d 841; Tian v. Tacquard, Tex.Civ.App., 147 S.W.2d 1114.

■ Appellants Watson are not in position to claim the rights of innocent purchasers, or Oak Cliff Savings & Loan Association as an innocent lien holder. So far as the record shows they had no dealings whatsoever with appellee. All their dealings were with Greenspan. Appellee's warranty deeds showing title to Kiestview Addition, including Lot No. 8, were filed for record in the deed records of Dallas County. Greenspan had no written memorandum of title whatsoever either filed for record or otherwise. The record before us is silent as to whether appellants checked the deed records of Dallas County before completing deals with Greenspan and Amblers. If they did check the deed records they must have found that Greenspan had no title, so they took a known risk in paying him and taking a deed from him. If they did not check the real estate title records, they cannot now be heard to complain that they did not know Greenspan had no title.

Appellants also argue that the deal between appellee and Greenspan was a "package" deal involving five lots in Kiestview Addition, not just Lot No. 8. However, the depositions and affidavits, together with exhibits plainly show that the sale of each lot was considered separately by the parties. A separate set of papers was drawn by the title company for each lot. Separate sales were made. Greenspan so states in his affidavit. See Simms-Wylie Co. v. City of Ranger, Tex.Civ.App., 224 S.W.2d 265.

■ It would not avail appellants even if we were to consider the transactions between appellee and Greenspan as a "package" deal. Though Greenspan has paid the full consideration for three of the lots he has not paid for Lots Nos. 6 and 8. Partial payment of consideration will not take the sale out of the Statute of Frauds. Christopher v. Garrett, supra; Massey v. Lewis, supra; Salas v. Salas, supra.

■ Appellants further argue that to allow appellee to prevail in its suit for title would result in an unjust enrichment of appellee at appellants' expense, therefore, would be inequitable. We shall not attempt to determine who has been or will be the greatest loser or gainer because of their dealings with Greenspan. The record

shows that Greenspan was indebted to appellee for a sum in excess of $17,600 because of his failure to pay the consideration for his purchase of four lots in Druid Hills Addition and two lots in Kiestview Addition. Under these circumstances we cannot say that appellee is being unjustly enriched, especially in view of the fact that (1) appellants had either actual or constructive notice from the deed records that Greenspan had no title and (2) appellee had no dealings with appellants and made them no promises whatever.

Appellants' first three points on appeal are overruled.

In their fourth point on appeal appellants Watson assert that it was error for the court to render judgment against them for $1875 the rental value of the property from October 15, 1959 to the date of judgment.

The record, including the pleadings of the Watsons, shows that they moved into the house on Lot 8 some time after they purportedly bought the property from the Amblers, but the exact date of the beginning of their occupancy is not shown. The record does show that on June 27, 1960 the Watsons executed an indemnity bond to protect appellee from loss of rent. The indemnity bond was executed to prevent the appointment of a receiver. In this indemnity bond the Watsons expressly state that on the date of the bond, June 27, 1960, they were occupying the premises.

The testimony of Sam Sutton, a real estate expert, shows that the rental value of the property was $140 per month. The judgment was signed November 28, 1960. The period of time from June 27, 1960 to and including November 28, 1960 is five months and one day. A simple arithmetical calculation shows that the rental value during said period would amount to $704.66. We think the record supports a judgment for rents for said period. Appellants' fourth point will be sustained in part to make the judgment for rents conform to the above holding.

That part of the judgment awarding appellee title and possession of the real property in controversy is affirmed. That part of the judgment awarding appellee the sum of $1875 as rents is modified so as to award appellee judgment for rents in the amount of $704.66. As so modified the judgment is affirmed.