Charles C. CHEATWOOD et ux., Appellants,

v.

Rosendo DE LOS SANTOS et ux., Appellees.

No. 5073.

Court of Civil Appeals of Texas, Eastland.

Jan. 26, 1978.

Rehearing Denied Feb. 16, 1978.

Herbert C. Martin, Amarillo, for appellants.

O. M. Calhoun, Folley, Snodgrass & Calhoun, Amarillo, for appellees.

McCLOUD, Chief Justice.

Plaintiffs, Rosendo De Los Santos and wife, Santos De Los Santos, sued defendants, Charles C. Cheatwood and wife, Louise Cheatwood, seeking specific performance of an oral contract to convey real property, and judgment for the excess of insurance proceeds paid to defendants, over and above the indebtedness, after the house in question was destroyed by fire. The case was tried by the court without a jury. Findings of fact and conclusions of law were filed. Plaintiffs were granted specific performance of the oral contract and judgment of $6,381.50 against defendants. Defendants have appealed. We affirm.

On March 21, 1974, the defendants as sellers and plaintiffs as purchasers entered into an oral contract for the purchase and sale of a house and lot. The total purchase price of the real property under the oral contract was $7,500. The parties agreed upon a $250.00 cash down payment and the balance payable in monthly installments of $55.00 per month starting on April 21, 1974. The purchasers went into exclusive possession of the premises and made payments pursuant to the contract for nineteen months. On October 16, 1975, the house was destroyed by fire. At the time of the fire, there was in existence a fire insurance policy in the name of defendants covering the premises in the sum of $12,500. Following the fire, the insurer paid defendants the sum of $12,500.

Defendants contend the insurance policy between defendants and the insurer was a personal contract and plaintiffs were not entitled to any of the proceeds. They argue that the oral contract to sell the real property was unenforceable because it violated the Statute of Frauds, Section 26.01, Texas Business and Commerce Code, and since

plaintiffs at the time of the fire had not paid the full consideration of $7,500, or made valuable and permanent improvements upon the house, the contract was not enforceable in equity under the rule announced in *Hooks v. Bridgewater*, 111 Tex. 122, 229 S.W. 1114 (1921). Plaintiffs argue that at the time of the fire they owned equitable title, were entitled to specific performance of the contract, and defendants held the insurance proceeds as trustee for plaintiffs.

On October 28, 1974, Mrs. Cheatwood wrote plaintiffs a letter which in part stated:

"We have not received your payment yet & it is past due 7 days today—we cannot continue like this on the payments on that house—we need our money when it's due, I paid the county tax on it, since they charge more if it is not paid in October—It was only $7.71 so please include that in your payment & the City tax will be due in January & it will be $82.44—this does not have to be paid until January & after that they charge interest & the insurance will be due again in February & you owe us 10 months insurance on this years—this is how it goes. We took out the insurance in February 21, 1973.

You bought house March 21," which would actually be 11 months, but we will only charge you 10 months   .   .   . Your insurance premium now is *$103.40*. The total was $124.00 which would be $10.34 a month × 10 = $103.40. We must have payments on time + keeping taxes paid when due (we will tell you). This insurance must be paid before November 20."

On January 29, 1975, Mrs. Cheatwood wrote plaintiffs as follows:

".   .   . Your insurance is due next month (February) & it will be about $135.00—I do not have the exact figure, if you can't pay these two amounts—we will have to raise your payments to $76.00 a month, which I expect you to pay $21.00 + The late charge on January's payment, I will be expecting a $25.00 check this week, then $76.00 by the 21st of each month thereafter—we cannot continue to pay taxes & insurance out of our own pockets, so to make it easy on you, we will do it this way—So please send us an extra $25.00 on January's payment or send us $82.44 + $4.00 late charge & this must be paid before the 31st. And if you send the taxes & then we expect you to pay the insurance with February's payment."

Mrs. Cheatwood testified as follows:

"Q How much were they supposed to pay a month?

A Fifty-five dollars a month.

Q And during this time was that ever raised from fifty-five a month?

A Yes.

Q To how much?

A Seventy-six.

Q What was the purpose of the raise?

A Because we just couldn't pay everything and we couldn't come over here and go back to Fritch all the time.

Q What was it for? Paying taxes and insurance?

A No. Because they had not paid any taxes and insurance.

Q You were paying taxes and insurance out of what they were paying you?

A Not out of the fifty-five a month.

Q Did you take it out of the seventy-six dollars a month?

A No. We paid that before. We paid that before they paid us the seventy-six dollars a month.

Q In 1974 you paid the taxes and insurance and did you pay the taxes, did you pay the insurance when it was due in 1975?

A Yes. Out of our own pockets."

She further testified:

"Q And then I will hand you another check, Mrs. Cheatwood, dated January 31st, 1975 for the sum of twenty-five dollars. Is that the increase we were talking about for taxes and insurance?

A  I raised the payments then.

Q  You raised their payments then.

Q  Now, Mrs. Cheatwood, on the 29th of January of 1975 you wrote a letter to Mr. and Mrs. De Los Santos wherein you explained to them you would need twenty-five dollars extra this month because you had to pay some taxes and insurance, did you not?

A  I raised their payments.

Q  Is that the letter you wrote that date?

A  (No response.)

Q  Is that your letter?

A  Yes, that's my letter.

Q  Mrs. Cheatwood, the twenty-five dollar check entered into evidence just now, is it the twenty-five dollars you asked them for in this letter?

A  Yes, I raised the payment.

Q  And in February 1975 you raised the payments to seventy-six dollars a month?

A  Yes.

Q  And they paid that up until the time of the fire?

A  But no insurance and taxes. That didn't cover the '74 insurance and taxes."

Mr. De Los Santos testified:

"Q  And how much were you supposed to pay a month?

A  Fifty-five.

Q  And when did you start the fifty-five dollar payments?

A  The first payment was in April.

Q  Of '74?

A  Yes.

Q  And did you make that payment?

A  Yes.

Q  And was there any conversation had at that time concerning taxes and insurance?

A  Not right then. But about a month later I asked her if we had insurance on the house and all that and she said since I was buying I was going to have to pay for that. She said thirty-eight dollars and something was principal and interest and the rest was for taxes or insurance.

Q  That part of the fifty-five dollars would be for principal and interest and part for taxes and insurance? When did she tell you that?

A  Around May or something like that.

Q  Did she tell you there was insurance on the property?

A  She said it was already paid for and I didn't have to worry about it for that year. It was already fixed up but after that I was going to have to come up with the insurance money.

Q  Then did you agree to buy the house on those terms?

A  Yes, sir."

He further testified:

"Q  Do you know whether or not there was insurance on the house?

A  Yes.

Q  How did you find out?

A  The lady came.

Q  Before that did you know there was insurance on the house?

A  Yes.

Q  You talked to Mrs. Cheatwood about it?

A  She told me she was going to raise the payments because of the insurance and taxes and she would take care of the insurance.

Q  Was that the purpose of raising your payments to seventy-six a month?

A  Yes."

Defendants introduced an insurance premium receipt showing that they paid $172.00 on February 19, 1975, for insurance coverage on the property in question.

Our Supreme Court in *Sharp v. Stacy*, 535 S.W.2d 345 (Tex.1976) recently stated:

"*Hooks v. Bridgewater, supra,* enumerated three requirements to relieve a parol sale of land from the operation of the statute of frauds. These in brief are: (1) payment of consideration, whether in money or services; (2) possession by the

transferee; and (3) making by the transferee of permanent and valuable improvements upon the land with the consent of the transferor . . ."

■ Defendants first argue that under *Hooks v. Bridgewater, supra,* all of the consideration must have been paid. We disagree. The case most nearly in point is *Walker v. Walker,* 448 S.W.2d 171 (Tex.Civ. App.—Waco 1969, writ ref. n. r. e.) wherein the court clearly held that payment of consideration in full is not required to render a parol sale of real property enforceable if the other two requirements, regarding possession and improvements, have been met. The court said:

"Contention 1 asserts judgment cannot be rendered for the vendee of an oral contract to convey unless the consideration be paid *in full*; that it is undisputed that the Bobby Walkers paid only $1076.12 of the $3804. purchase price. Appellants cite *Salas v. Salas,* Tex.Civ. App. (NRE) 229 S.W.2d 881; *Watson v. Druid Hills Co.,* Tex.Civ.App. (NRE) 355 S.W.2d 65; and *Pennington v. Bennett,* Tex.Civ.App. (NRE) 436 S.W.2d 182 as controlling. These cases, citing *Hooks v. Bridgewater,* 111 Tex. 122, 229 S.W. 1114, 15 A.L.R. 216, state that to relieve an oral sale from the operation of the Statute of Frauds, payment of the consideration *in full,* together with possession, and the making of improvements by the vendee is necessary. The requirement that payment of the consideration be *'in full'* is dicta.

In any event *Hooks v. Bridgewater* states:

' * * * to relieve a parol sale of land from the operation of the statute of frauds, three things (are) necessary: 1. Payment of the consideration, whether it be in money or services. 2. Possession by the vendee. And 3. The making by the vendee of valuable and permanent improvements upon the land with the consent of the vendor * * *. *Payment of the consideration, though it be a payment in full,* is not sufficient * * * nor is posses-

sion of the premises by the vendee * * *. Each of these elements is indispensable, and they must all exist.'

*Hooks v. Bridgewater* was decided *April 13, 1921,* and was but a restatement of the existing law. The 1879 case of *Ponce v. McWhorter,* 50 Tex. 562, 571, recites: 'The cases in this court are numerous in which verbal sales of land have been recognized as valid, and enforced where the purchase money has been paid, possession taken with the consent of the vendor, and improvements made without his objection. (*Garner v. Stubblefield,* 5 Tex. 552; *Dugan's Heirs v. Colville's Heirs,* 8 Tex. 126; *Ottenhouse v. Burleson,* 11 Tex. 87; *Whitson v. Smith,* 15 Tex. 33, 36; *Neatherly v. Ripley,* 21 Tex. 434; *Hubbard v. Horne,* 24 Tex. 270; *Taylor v. Rowland,* 26 Tex. 293; *Hendricks v. Snediker,* 30 Tex. 296, 306; *Robinson v. Davenport,* 40 Tex. 333, 341; *Ann Berta Lodge v. Leverton,* 42 Tex. 18, 21; *Castleman v. Sherry,* 42 Tex. 59; *Willis v. Matthews,* 46 Tex. 478, 483).'

The *Neatherly* and *Dugan Heirs* cases, *supra,* hold that a vendee having paid a *portion* of the purchase price under a parol agreement for the sale of land, and having taken possession and made improvements thereon, is entitled to specific performance of such agreement.

And the Supreme Court in *Clegg v. Brannan,* 111 Tex. 367, 234 S.W. 1076, 1078 (decided November 16, 1921 and after *Hooks v. Bridgewater*) said: 'Possession, payment of the purchase price in full *or in part* and valuable improvements clearly would take the case out of the statute (of frauds).'

Other cases holding that payment of the purchase price *in part* suffices are *Hunt v. Evans,* Tex.Civ.App., Er. Ref., 233 S.W. 854, 858; *Shannon v. Staha,* Tex.Civ.App., Er. Dismd., 233 S.W. 1038; *Reeves v. San Antonio Bldg. Materials Co.,* Tex.Civ.App., Er. Refused, 27 S.W.2d 904, 906; *Willis and Conner v. Turner,* Tex.Civ.App., Er. Dismd., 25 S.W.2d 642, 646; *Blum v. Dismuke,* Tex.Civ.App., Er. Dismd., 314 S.W.2d 635; *Union Properties Co. v. Klein,* Tex.Civ.App. (NRE) 333 S.W.2d 864, 865, 868."

The Austin Court of Civil Appeals in *Ojeda v. Ojeda*, 461 S.W.2d 487 (Tex.Civ.App.—Austin 1970, writ ref. n. r. e.) followed the rule announced in *Walker, supra,* that payment of consideration in full was not required.

We hold that payment of consideration in full is not required in the instant case if the other requirements enumerated in *Hooks v. Bridgewater, supra,* are met. Plaintiffs had been in exclusive possession of the house for nineteen months and had paid the monthly installments. The trial court found that plaintiffs made permanent and valuable improvements in good faith believing that they had purchased the property. Defendants argue there is no evidence to support such finding or, alternatively, the finding is against the great weight and preponderance of the evidence. We disagree.

Mr. De Los Santos testified he replaced three window panes; put new linoleum in the kitchen; placed a cabinet on a wall; installed a new front door; repaired a gas line and pipe; painted the kitchen, bathroom, marks on the doors and outside windows; put in hall panels; and, repaired the roof following a hailstorm. There is evidence plaintiffs spent approximately $115.85 for materials, but this amount did not include the value of Mr. De Los Santos' labor. Plaintiffs did not buy the shingles for the roof. Defendants bought the shingles. Mrs. Cheatwood testified they received some "insurance money" for the damaged roof, but not enough to cover it. Mr. De Los Santos testified the insurance company paid defendants for the shingles but he did the work. He said it took him about three weeks working in the evenings after his regular job to repair the roof. It was necessary to first tear down the old roof. He testified his labor for repairing the roof alone was worth $300.

Mrs. Cheatwood testified she visited the house the day after the fire and she did not observe that any painting had been done in the kitchen. She also stated she furnished seven gallons of paint and that she had put a new kitchen linoleum in just before plaintiffs moved into the house. Mr. De Los Santos denied that defendants furnished any paint.

We hold there is some evidence to support the court's finding and after considering all the evidence as required by *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951), we hold the finding is not against the great weight and preponderance of the evidence. See: *Davis v. Douglas*, 15 S.W.2d 232 (Tex.Com.App.1929, holding approved); *Davis v. Crockett*, 398 S.W.2d 302 (Tex.Civ. App.—Dallas 1965, no writ); *Hines v. Taylor*, 476 S.W.2d 81 (Tex.Civ.App.—Houston (14th Dist.) 1971, no writ).

We hold the trial court correctly determined that plaintiffs met the requirements necessary to render the contract enforceable in equity notwithstanding the Statute of Frauds.

Since the contract was enforceable, plaintiffs under the executory contract were the equitable owners of the property. We think the appropriate rule is stated in 64 A.L.R.2d 1406 § 4 (1959) as follows:

"Where the purchaser as equitable owner will bear the loss occasioned by a destruction of the property pending completion of the sale, and the contract is silent as to insurance, the rule quite generally followed is that the proceeds of the vendor's insurance policies, even though the purchaser did not contribute to their maintenance, constitute a trust fund for the benefit of the purchaser to be credited on the purchase price of the destroyed property, the theory being that the vendor is a trustee of the property for the purchaser."

See also: 77 Am.Jur.2d, Vendor and Purchaser, §§ 370–371 (1975), and 46 C.J.S. Insurance § 1145 (1946).

We have found no case directly in point. Our Supreme Court in *Paramount Fire Insurance Company v. Aetna Casualty & Surety Company*, 163 Tex. 250, 353 S.W.2d 841 (1962) dealt with a related problem involving which insurance company was liable when both the seller and purchaser had

separate policies covering improvements destroyed by fire. The court said:

". . . As it is not before us here, we leave open the question of whether, where the vendee has no insurance, there can be recovery on the vendor's policy subject to a constructive trust for the vendee, who is often ignorant of his legal liability in such a situation . . ."

Although the case is distinguishable, we conclude from language used by the court that the controlling question in the instant case is whether the plaintiffs or defendants suffered the loss, and this is determined by viewing the whole transaction including related events occurring after the fire. See Powell, Vendor and Purchaser—Insurance, 16 Baylor L.Rev. 304 (1964).

In the instant case, plaintiffs sought and the trial court granted plaintiffs specific performance of the contract. The trial court concluded that the payment of the insurance proceeds to defendants was pro tanto satisfaction of the balance of the purchase price. The plaintiffs would bear the loss resulting from destruction of the property. The trial court determined what plaintiffs owed defendants under the contract by deducting the sum of the payments made from the original selling price of $7,500. The court found that plaintiffs had made payments of $1,381.50 at the time of the fire; therefore, plaintiffs owed defendants $6,118.50 on the purchase price. The court deducted this amount from the $12,500 which defendants had received from the insurer and awarded plaintiffs a $6,381.50 judgment which was the excess of the insurance proceeds over and above the indebtedness owed defendants. The defendants have received the amount of the unpaid purchase price. They have suffered no loss. We hold the trial court correctly held that the defendants held the insurance proceeds in trust for plaintiffs.

Defendants argue that the court's finding of fact that at the time of the fire the balance owed upon the purchase price was the sum of $6,118.50 conclusively establishes that all of the $1,381.50 paid by plaintiffs was applied to the purchase price and none

of it was applied to insurance or taxes. Defendants say this finding by the court establishes that defendants alone paid the premium for the $12,500 policy of insurance issued to them. There is evidence in the record that a part of the monthly payments were to be applied to the cost of insurance. The trial court found that at the request of defendants, beginning in January of 1975, the monthly installments were increased from $55.00 per month to $76.00 per month, and defendants informed plaintiffs that the increase was necessary for the purpose of paying the annual taxes and insurance premiums. The court also found that before the increase of monthly installments the defendants had agreed to pay the taxes and insurance out of the $55.00 per month. These findings of fact by the trial court are not properly challenged. We think it is immaterial, under the peculiar facts of this case, that defendants used their funds to pay for the policy of insurance. Also, we place no significance on the fact that the mathematical calculation used by the trial court apparently credits all of plaintiffs' payments to the reduction of principal. Defendants do not complain of the trial court's failure to apply a portion of the monthly payments to interest, taxes, and insurance, even though the trial court expressly found that the monthly installments included 7% interest per annum and the installments were increased at the request of defendants who informed plaintiffs the increase was necessary for paying annual taxes and insurance premiums. Indeed, defendants opposed an attempt by plaintiffs to show by supplemental brief that only a portion of the $1,381.50 paid by plaintiffs should be applied to the principal owed at the time of the fire, thereby, reducing the personal judgment against defendants.

We have considered all points of error and all are overruled. Judgment of the trial court is affirmed.